TROY CARRIAGE SUNSHADE CO. v. KINSEY MFG. CO.

(Circuit Court of Appeals, Sixth Circuit. November 16, 1917.)

No. 2994.

1. PATENTS ⊚=328—VALIDITY AND INFRINGEMENT—WIND SCREEN FOR VEHI-
CLES.
   The Lingley patent, No. 890,667, for a wind screen for motor vehicles,
   claim 1, discloses invention over the prior art, and is not subject to any
   limitation beyond that expressed on its face; also *held* infringed.

2. PATENTS ⊚=35—INVENTION—PRIOR ART.
   Where a prior patent is introduced, not to show anticipation, but that
   the step in advance by the patent in suit was not sufficient to constitute
   invention, the fact may be considered that the device of the earlier patent
   never went into use.

Appeal from the District Court of the United States for the West-
ern Division of the Northern District of Ohio; John M. Killits, Judge.

Suit in equity by the Troy Carriage Sunshade Company against
the Kinsey Manufacturing Company. Decree for defendant, and
complainant appeals. Reversed.

Alfred M. Allen and Marston Allen, both of Cincinnati, Ohio, for
appellant.

Owen, Owen & Crampton, of Toledo, Ohio (Wilber Owen, of To-
ledo, Ohio, of counsel), for appellee.

Before KNAPPEN and DENISON, Circuit Judges, and McCALL,
District Judge.

DENISON, Circuit Judge. The District Court, because it thought
there was no infringement, dismissed the bill brought by the appellant
against the appellee and based upon the first claim [1] of patent No.
890,667, granted June 16, 1908, to Lingley, for a weather screen for
motor vehicles.

By way of improvement upon the solid one-piece glass windshield
extending from the dash of the vehicle up to a level above the driv-
er's head it had become common, before Lingley appeared, to make
the shield in two sections and to provide for the separate manipulation
and adjustment of either or both sections; and it was known to be
desirable to provide for tilting the upper section forward at its lower
edge, so as to provide an open space through which the driver could
see the road in front, and so as to permit the driver to receive some
air, but not too much. It was also the common practice that this upper

[1] Claim 1.—In a wind screen for vehicles, a fixed lower part carried by
standards and an upper movable part centrally mounted upon centers perma-
nently fixed at the upper ends of solid arms, the lower ends of which are
mounted upon centers permanently fixed upon the lower fixed part, and means
for fixing the arms at any desired angle with the lower fixed part and means
for fixing the upper movable part at any desired angle with the arms, sub-
stantially as herein shown and described and for the purpose stated.

⊚=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

part of the shield should be capable of turning entirely down opposite the lower section, so that there would be no obstacle in front of the driver's head and shoulders. The rigid permanently up-standing surrounding frame, carrying separately the upper and the lower sections, which has of late become the accepted form, did not readily lend itself to this entire removal of the upper section, and (perhaps for that reason) was then not largely used.

[1] It is not claimed that Lingley's device was anticipated, but it is insisted that his advance was not of the inventive character. The prior art, so far as it is close enough to be important, is represented by Sprague (unpatented) and Bill (British patent, No. 10,652, of 1906). Sprague supported his upper section upon the lower one by resting the bottom of the upper frame directly on the top of the lower frame, and the weight was chiefly, if not wholly, carried in this way. At each end he provided a sliding bolt carried by the upper frame and dropping into sockets in the lower frame, whereby he prevented lateral motion of the upper on the lower. Upon the dash and just at the bottom of the lower frame, he provided suitable brackets upon which the bottom of the upper frame could be supported and carried and having sockets into which the sliding bolts could be dropped. When the driver did not wish the upper section of the windshield in place, what happened, in substance, was, that he raised the sliding bolts from their engagement, lifted the upper section out of position, placed it on the lower brackets and slid the bolts into their new sockets. So far, we see no resemblance to Lingley; but for the purpose of preserving the parallelism of the sections while the upper one was being lowered, and probably also for assisting to hold the upper one against vertical displacement while in either upper or lower position, Sprague provided links pivoted to the lower frame at its outside upper edges, and to the upper frame at the centers of its outside edge. These links were metal rods or bars, and have a close mechanical resemblance to the rigid arms of Lingley; but, functionally, they were wholly distinct, because Sprague contemplated nothing and could do nothing except to carry his upper section fastened in the extreme upper or extreme lower position.

In Bill, the resemblance is closer, functionally, and less, mechanically. He also carried his upper section upon the lower one and intended to fold the former all the way down beside the latter on occasion, but he also contemplated adjusting the upper section and holding it at intermediate tilted positions. His thought seemingly was that the upper section should have almost unlimited freedom of movement and be movable forward or back, up or down, and tilted in either direction. To accomplish this, he provided, on the outside of his frames, a wide and deep slot continuous in upper and lower sections. Closely fitting in this slot or groove, he carried a flat metallic bar about as long as the height of either section. This bar itself was centrally slotted, and through this central slot passed threaded studs, projecting, respectively, from the lower section near its upper edge and from the upper section near its lower edge. Obviously, the slotted bar could move up and down, guided by these studs in its central slot. Upon

the threaded studs were provided binding means in the form of wing nuts. The result was that, when the upper section was placed upon the lower and all four winged nuts were tightened, the two sections were rigidly located in that position through the connecting metallic bars bound into the upper and lower parts of their grooves. When it was desired to change the position, all four wing nuts must be loosened and screwed out far enough, so that the slotted bars could be lifted out of their grooves. Then they became mere links, not with fixed end pivots, as in Sprague, but sliding freely for a relatively long distance. If the upper section was tilted forward, the bars, resting upon the edges of their grooves, would assume an angular position, and all four nuts could then be tightened, and the parts held in that position. After this had been done, so that the bars were out of their grooves, further tilting of the upper section alone could be accomplished by loosening only the two upper wing nuts.

[2] Inspection of this Bill device is sufficient to condemn it as impractical, though not inoperative in the strictly mechanical sense. If manufactured of the necessary full size and weight, it is doubtful whether it could be manipulated by one man—certainly not without stopping his car and using both hands at once. As soon as all four nuts were loosened, the bars would drop to their lowest position, leaving nothing to support the upper section when moved. It does not seem that the binding of the arms in their angular position against the edges of their grooves would be sufficient to maintain them against jarring loose. At any rate, there is nothing to indicate that the Bill device ever went into use; and, since we are not concerned with the question of anticipation, but only with that of the character of the step in advance, this seems the typical instance when it may be of some logical importance that the earlier patent is rightly named a "paper patent." Its nonuse commercially, unexplained, has some tendency to indicate that the device was not of practical value, and that it lacked some essential element of commercial utility, the supplying of which might call for the inventive faculty.

It is clear enough that what Lingley did involved invention over Sprague alone, or over Bill alone; the question, when we consider both of them and their possible composite effect, as we must, is close and by no means free from doubt. If the solid arm with fixed end centers of Sprague is substituted for the slotted bar or free link of Bill, or if the threaded studs and binding nuts of Bill are substituted for the mere pivots of Sprague, we disclose at once the functional operation of Lingley. Either one of these seems now a rather natural and simple change; but we are convinced that more was involved than the mere substitution of known equivalents. Sprague did not contemplate any intermediate adjustment of the upper section; he guarded against it by his locking bolts. To make his device work with the addition of wing nuts like Lingley's, these bolts must be removed and Sprague's primary idea forgotten. So, if we substitute the Sprague arm for the Bill link, it involves a reorganization of both, and such a solid arm would be inconsistent with the thing which Bill was trying to do. If the arm remained of Sprague's length, so as to be pivoted

at the center of the upper section, it would be impossible for that section to take many of the positions which Bill indicated; while, if the arm were shortened and pivoted to the upper section, as in Bill, the extreme lower position could not be reached at all, and the tilting of the upper section outward at the bottom would result mainly in tilting it in at the top. The fundamental theories of the two devices were so distinct and inconsistent that we are satisfied there was invention in taking features from each and modifying and combining them as Lingley did. He attained an efficiency and a convenience in the adjustment of the upper section which were not reached by either of the others, and he had a folding and practically useful clear-vision windshield which neither of the others had. This was, fairly speaking, a new result, and we think the claim should be sustained.

There seems no occasion for any limitation not expressed on the face of the claim. Lingley was the first to make a two-part windshield in which the lower part was supported by the vehicle body and the upper section was supported and carried by the frame of the lower section; this support being through rigid arms pivoted to the lower section near its upper edge and to the upper section near its center, these pivots being capable of being loosened to permit adjustment and tightened to hold in position. By this means it resulted that, without the aid of any surrounding frame, the upper section could be tilted forward in its lower part to provide clear vision underneath, and by adjusting only the pivots of the upper section, and yet the whole upper section could be folded all the way down, if desired. The utility of this is not to be denied. It is true that, with the upper section pivoted at the center, some rain or snow will go in at the top, when the bottom is tilted forward; but the same thing is true of defendant's device, and it cannot be heard to claim anything on account of this practical imperfection.

We do not understand it to be claimed in this court that defendant's device differs essentially from Lingley, except in the one respect now to be considered; the equivalency between Lingley's shield-supporting standards and defendant's shield frame and supporting clips is apparent. So far as may be inferred from Lingley's specification and drawings, he contemplated adjustment of the upper section only by tilting its lower part forward; indeed, he shows such an overlapping that inward tilting would have been impossible. In the defendant's form, the two sections meet flush, and the bottom of the upper one can be tilted inwardly, the result of which is that a current of air is driven inwardly and downwardly. This type of ventilation became desirable after the date of Lingley's patent, by reason of the later adoption of the fore doors, which for the first time, caused the necessity for ventilating the lower part of the driver's compartment; and it is said that the defendant accomplished a result which Lingley intended to prevent. We are unable to give this consideration any force upon the question of infringement, because, when we observe Lingley's claim, the defendant's position is that infringement is avoided because, though it has used all of the claim, it has added something more. Lingley contemplated, and his first claim secured to him, a device capable of

use in three positions: Extreme upper, extreme lower, and intermediate forward tilting. The defendant takes substantially the same form of device, capable of the same use in all three of the same positions, but makes a slight alteration so that it is capable of use in another position. Lingley had functions 1, 2, 3; defendant has functions 1, 2, 3, 4. Of course, this does not avoid infringement.

The second claim of Lingley (not in suit) makes reference to the overlapping which would prevent inward tilting and which accomplished one of the declared objects of the invention. This is not mentioned in the first claim, which relates to another declared object; and this alone would be sufficient reason for not importing the overlapping into the first claim, even if its broad language would justify such importation. Nor do we find any difficulty arising from the claim provision that the upper removable part is capable of being fixed "at any desired angle." It is difficult to see how this bears on the question of infringement, since the defendant's device responds to this specification even more accurately than the patent drawings do. In defendant, the fixing may be at any desired angle throughout the circumference. In the form shown in the Lingley drawing, and covered specifically by the second claim, the permitted adjustment extends through a quarter of the circumference only. The utmost effect which the presence in Lingley of the specific drawing and description could have is that the first claim should be interpreted as referring only to the forward angles; but this would not help defendant, which uses the same forward adjustment shown by Lingley.

We find nothing of importance in defendant's favor to be drawn from the commercial history of the patent and the device. Plaintiff's manager devised a windshield and plaintiff put it on the market. It was some time afterwards practically copied by the defendant. Plaintiff's manager undertook to get a patent on his construction, and failed to do so on account of the existence of the Lingley patent, disclosed to him in the Patent Office. Plaintiff then bought the Lingley patent and continued to exploit the device commercially on a very large scale. If, as is held in the Paper Bag Case, 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122, a patent is not to be denied its reasonable and apparent validity and scope merely because its owner had deliberately withheld it from commercial use, much less can such denial be claimed where the first owner, for unknown reasons, did not get it into public use, but where the second owner has put it into very general use. The fact that the second owner discovered the patent in the Patent Office, and made the first move to buy it, and bought it for a small price, cannot be of much, if any, importance. The patent must stand or fall on its own merits.

We think there should be the usual decree for injunction and accounting upon the first claim, and the decree below must be reversed, and the case remanded for that purpose.